ATTACHMENT "2"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ROCHELLE THIBODEAUX | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No. |
| | ) | 1:21-cv-02671-LMM-CCB |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| CITY OF ATLANTA, GEORGIA | ) | Jury Trial Demanded |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES**

NOW COMES the Plaintiff, ROCHELLE THIBODEAUX, through her undersigned counsel of record, and pursuant to Federal Rule of Civil Procedure 15(a)(2), hereby files this Second Amended Complaint against Defendant, CITY OF ATLANTA, GEORGIA (hereinafter, referred to as "Defendant" or the"City"), which Second Amended Complaint replaces the original Complaint for Damages and First Amendment to Complaint.  Plaintiff states to the Court the following:

**JURISDICTION AND VENUE**

**1.**

This action is brought by the Plaintiffs for damages against Defendant pursuant to 42 U.S.C. § 1983 and Fourteenth Amendment to the U.S. Constitution;

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.,

as amended; the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*;

and the claim of invasion of privacy under Georgia law.

**2.**

Plaintiff invokes this honorable Court's federal question jurisdiction

allowing this action to be brought in any judicial district in the state in which

the unlawful employment practice was committed, and 28 U.S.C. §§ 1331 and

1343. Plaintiff seeks money damages, declaratory and injunctive relief,

expenses of litigation, including reasonable attorney fees and costs, statutory

penalties, and punitive damages.

**3.**

Venue is proper in this Court as the facts giving rise to Plaintiff's claims

occurred within the area encompassed by the  United States District Court for

the Northern District of Georgia, and in particular, the Atlanta Division of said

Court pursuant to 28 U.S.C. § 1391.

**THE PARTIES**

**4.**

Plaintiff is a citizen of the United States of America. During all times

relevant to this action, Plaintiff resided in Fulton County, State of Georgia.

Plaintiff submits herself to the jurisdiction of the United States District Court for the

Northern District of Georgia for any and all purposes related to or arising from the action within.

**5.**

Defendant is a municipal corporation organized and existing under the laws of State of Georgia with the capacity to sue and be sued; and therefore, subject to personal jurisdiction in Georgia.

**6.**

Defendant may be properly served with process by delivering a copy of the summons and complaint to Mayor Keisha Lance Bottoms at the Office of the Mayor, Executive Offices, 55 Trinity Avenue, SW, Atlanta, Georgia 30303.

**7.**

During all times relevant to this action, Plaintiff was employed with Defendant and worked in the City's Public Works Department.

**8.**

During all times relevant to this action, Defendant met the jurisdictional prerequisites for a claim under Title VII.

**9.**

During the relevant time period, Defendant was an "employer" as defined by Section 701(b) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e(b)) and is thus, covered by, and subject to, the provisions of Title

VII, 42 U.S.C. § 2000e et seq., as amended.

**10.**

Defendant, including its supervising personnel, officials,agents, officers, and employees were responsible for all acts complained of herein.

## NATURE OF THE ACTION

**11.**

This action arises out of events during Plaintiff's terms and conditions of employment with Defendant. Therefore, this action seeks nominal, compensatory, punitive, and liquidated damages, backpay with interest and front pay, if applicable, based upon the Defendant's intentional discriminatory conduct, retaliation, and other unlawful employment practices under 42 U.S.C. § 1983 and Fourteenth Amendment to the U.S. Constitution; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., as amended; the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq*.; the Consolidated Omnibus Budget Reconciliation Act (COBRA) . Plaintiff also asserts the claim of invasion of privacy under state law.

## FACTUAL ALLEGATIONS

**12.**

At all times relevant hereto, Plaintiff was employed full-time with Defendant. Defendant terminated Plaintiff's employment sometime in 2021, with

the actual date of termination being disputed by the parties.

**13.**

During the relevant time period of Plaintiff's complaint, Plaintiff

worked in Defendant's Public Works Department at 1150 North Avenue,

Atlanta, Georgia.

**14.**

In or around August 5, 2019, Plaintiff was being trained for the supervisor

position by Jeffrey Allen.

**15.**

While working at 2849 Perry Boulevard NE, Atlanta, Georgia, Jeffrey Allen

groped Plaintiff's breast and touched Plaintiff's buttock. While in a work vehicle

and at a second job location, Jeffrey Allen touched Plaintiff's face in a suggestive

manner.

**16.**

Upon Plaintiff's return to 1150 North Avenue, Plaintiff immediately spoke

with Area Supervisor Derrick Boddie. Plaintiff  explained to Derrick Boddie what

happened. Derrick Boddie called Allen Smith, Plant Manager.

**17.**

While Plaintiff was waiting for Allen Smith, Jeffrey Allen came over to

where Plaintiff was sitting and touched her nose.

**18.**

Once Allen Smith arrived, Plaintiff informed him of what JeffreyAllen did to her. Defendant did not take the appropriate corrective action to timely investigate or properly address Plaintiff's complaints. Rather, Plaintiff suffered retaliation because she had reported Jeffrey Allen's actions. Plaintiff met with a representative from HR, Joe Banks, Schyuler and Joe Banks.  They said they were going to investigate and Plaintiff was going to go on paid leave in the mean time.

**19.**

Jeffrey Allen asked two different people to write fake statements that Plaintiff was lying.  They both refused, and thereafter, they have been retaliated against.

**20.**

On August 13, 2019, Defendant placed Plaintiff on Administrative Leave with Pay while her complaints were investigated.

**21.**

On August 30, 2019, Defendant closed the investigation stating that Plaintiff's complaint could not be substantiated.

**.22.**

After Plaintiff returned to work, she was subject to constant retaliation and

harassment.  For the period of September and October, 2019, Plaintiff was constantly harassed.

When Plaintiff returned to work, she was very sickly.  She was in and out of the hospital. The coworkers started saying she had AIDS.  She was mentally depressed.

Installation Chief Todd Miles sent Plaintiff to get her DOT card.  He sent her knowing that she was on medication and couldn't drive.

Cotena came to her and asked why she wasn't driving. Plaintiff  had already turned in medical records. Cotena got Plaintiff's medical files and looked around. Also , Several of Thibodeaux's coworkers spread rumors that Thibodeaux was sleeping with one coworker's boyfriend, that she was doing drugs with the boyfriend, that Thibodeaux has HIV, and that Thibodeaux was a COVID-19 carrier.

**23.**

Around the beginning of November, 2019, Plaintiff was out working when she was called back in and sent home. Someone had reported that Plaintiff was shooting a gun while she was out working.

**24.**

Allen Smith refused to tell Plaintiff  who allegedly saw her or where she was allegedly shooting a gun. This allegation was totally false, and a subsequent investigation proved it to be false. Whoever made the false report did it with the intent of making Plaintiff resign her position.

**25.**

Plaintiff reported these false statements to Plant Manager Allen Smith, Installation Chief Todd Miles, and Concrete Area Supervisor Marquis Phelps, but nothing was done.

**26.**

Later, a coworker accused Plaintiff of forging a doctor's note. Allen Smith had let the coworker see Plaintiff's medical file. Because of this, Human Resources sent some paperwork to Plaintiff's doctor to fill out.

**27.**

Plaintiff has reported this harassment, retaliation, defamation of character and bullying, but no administrative actions have to be taken to remedy her harm despite legal obligations and company policy.

**28.**

In May of 2020, a coworker called Plaintiff "a piece of shit." The coworker asked Plaintiff's supervisor, "You haven't got rid of that piece of shit yet?"

**29.**

Plaintiff met with Installation Chief Todd Miles and Plant Manager Allen Smith about this hostility. During the meeting, he recommended that she move to a different department.

**30.**

Additionally, Plaintiff's medical information has been disclosed to people

who did not and do not need to know it.  Allen Smith let other people read

Plaintiff's medical records.

## 31

The constant harassment, retaliation, defamation of character and bullying

has taken a severely negative toll on Plaintiff's health. Plaintiff is under treatment

by several doctors due to the stress of dealing with her hostile work environment.

## 32.

Due to Plaintiff's medical condition, she ended up missing a good amount of

work.

## 35.

Plaintiff used sick time and vacation time to cover for when she was out of

work.

## 36.

On or about August 21, 2020, Plaintiff's counsel sent an *Ante Litem Notice*

to the City of Atlanta pursuant to O.C.G.A. §36-33-5(b) regarding Plaintiff's

claims of sexual harassment against Jeffrey Allen and the City's failure to

properly investigate Plaintiff's complaints or prevent further harassment.

## 37.

Sometime in 2021, Defendant terminated Plaintiff's employment.

## 38.

Plaintiff was not provided with any written notices that Defendant was

considering terminating her. Plaintiff was given no opportunity to respond.

**39.**

During the time of her employment with Defendant, Plaintiff constantly feared further harassment, retaliation, and intimidation by Defendant's management and supervisory officials, including the loss of her job.

**40.**

On or about October 9, 2020, Plaintiff filed a formal charge of discrimination (hereinafter, "EEOC Charge") against Defendant for sexual harassment, sex discrimination, hostile work environment, and retaliation in violation of Title VII. A true and accurate copy of the EEOC Charge is attached hereto as Exhibit "A," which is made a part hereof by reference.

**41.**

`On or about April 8, 2021, the U.S. Department of Justice (DOJ) issued Plaintiff a Notice of Right-to-Sue (hereinafter "Right to Sue") notifying Plaintiff of her rights to file a lawsuit against Defendant *within 90 days of receipt* of the Notice. A true and accurate copy of the Right- to-Sue Notice is attached hereto as Exhibit "B," which is made a part hereof by reference.

## COUNT I – DISCRIMINATION/HOSTILE WORK ENVIRONMENT

### 42 U.S.C. § 1983 and Fourteenth Amendment to the U.S. Constitution And Title VII of the Civil Rights Act of 1964

**42.**

The elements of a claim of discrimination under Title VII and section 1983 are the same. Rice–Lamar v. City of Ft. Lauderdale , 54 F.Supp.2d 1137, 1145 (S.D.Fla.1998).

**43.**

To establish a hostile work environment claim, a plaintiff must show that: (1) she belongs to a protected group; (2) she suffered unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for that environment under a theory of either direct liability or vicarious liability. Miller v. Kenworth of Dothan, Inc. , 277 F.3d 1269, 1275 (11th Cir. 2002).

Fernandez v. Trees, Inc., 961 F.3d 1148 (11th Cir. 2020)

**44.**

An employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher v. City of Boca Raton,

524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998). The

employer will be strictly liable for the hostile environment if the supervisor takes

tangible employment action against the victim. See id. at 807, 118 S. Ct. 2293.

Miller v. Kenworth of Dothan Inc., 277 F.3d 1269 (11th Cir. 2002).

**45.**

Plaintiff is female, which is a protected class under Title VII and the

Fourteenth Amendment.

**46.**

While working at 2849 Perry Boulevard NE, Atlanta, Georgia, Jeffrey Allen

groped Plaintiff's breast and touched Plaintiff's buttock. While in a work vehicle

and at a second job location, Jeffrey Allen touched Plaintiff's face in a suggestive

manner.  Upon Plaintiff's return to 1150 North Avenue, Plaintiff immediately

spoke with Area Supervisor Derrick Boddie. Plaintiff  explained to Derrick Boddie

what happened. Derrick Boddie called Allen Smith, Plant Manager.

**47.**

The harassment did affect the conditions of Plaintiff's employment.

**48.**

"To be actionable, this behavior must result in both an environment that a

reasonable person would find hostile or abusive and an environment that the

victim subjectively perceives to be abusive. In evaluating the objective severity of

the alleged hostile work environment, we consider (1) the frequency of the

conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. Short v. Immokalee Water &amp; Sewer Dist., 165 F.Supp.3d 1129 (M.D. Fla. 2016).

**49.**

Plaintiff subjectively perceived the environment abusive.

**50.**

The sexual assault and battery committed by Jeffrey Allen, while not frequent, was very severe.

**51.**

[C]ourts have held that certain combinations of inappropriate touching with unwelcome, sexual remarks may be sufficient evidence of sexual harassment. See, e.g. , Kimsey v. Akstein , 408 F.Supp.2d 1281, 1298 (N.D. Ga. 2005) (denying summary judgment where there was "a pattern of less severe verbal harassing and touching that, viewed in its entirety and with the breast [touching] incidents, is sufficiently pervasive"); Beliveau v. Caras , 873 F.Supp. 1393, 1398 (C.D. Cal. 1995) (denying motion to dismiss where plaintiff alleged "several incidents in which defendant Rickell made 'off-color, flirtatious and unwelcome remarks' " and "an incident of offensive touching").

West v. DJ Mortg., LLC, 271 F.Supp.3d 1336 (N.D. Ga. 2017)

**52.**

Also, Plaintiff was negatively impacted.  The constant harassment, retaliation, defamation of character and bullying has taken a severely negative toll on Plaintiff's health. Plaintiff is under treatment by several doctors due to the stress of dealing with her hostile work environment.  Plaintiff's poor health caused her to miss a good amount of work.

**53.**

Defendant, through its agents, were acting under color of state law and violated Plainitiff's Constitutional rights.

**54.**

Municipalities are included in persons acting under color of state law.

Monell v. Dep't of Social Servs., 436 U.S. 658, 693–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**55.**

"[T]he employer can be responsible for the harassing conduct under a theory of either vicarious liability or direct liability. Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012). When, as here, the perpetrator of the harassment is not the plaintiff's supervisor, the employer will be held directly liable only if it knew or should have known of the harassing conduct but failed to

take prompt remedial action. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269,

1278 (11th Cir. 2002).

Wilcox v. Corr. Corp., 892 F.3d 1283 (11th Cir. 2018).

**56.**

Defendant is responsible for the actions of its agents, who were acting

under the color of state law, because they were acting in accordance with an

official custom or policy of Defendant.  Sexual harassment of and retaliation

against women is rampant in Defendant's Public Works Department, with the

supervisors covering up for the harassers and punishing the victims.  The

supervisors routinely ignore women's complaints of sexual harassment, or if

they don't completely ignore them, they are very slow to take action.  Women

that complain are retaliated against by not only the harasser, but also other

supervisors in the Public Works Department.

**57.**

"§ 1983 liability may be imposed on a municipality based on "governmental

'custom' even though such a custom has not received formal approval

through the body's official decisionmaking channels." Id. at 795. This Court

set out the standard for imposing such liability in Brown, stating that: [t]o

prove § 1983 liability against a municipality based on custom, a plaintiff

must establish a widespread practice that, "although not authorized by

written law or express municipal policy, is so permanent and well settled as

to constitute a 'custom or usage' with the force of law." Brown, 923 F.2d at 1481 (citations omitted). In addition, we have also held that a municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy "if the municipality tacitly authorizes these actions or displays deliberate indifference" towards the misconduct. Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir.1987)."

Griffin v. City of Opa-Locka, 261 F.3d 1295 (11th Cir. 2001).

**58.**

Plaintiff bases her allegations of custom or policy and deliberate indifference on the following facts:

Facts relating to Plaintiff:

a. In or around August 5, 2019, Rochelle Thibodeaux, who worked for Defendant's Public Works Department, was being trained for the supervisor position by Jeffrey Allen.

b. While working at 2849 Perry Boulevard NE, Atlanta, Georgia, Jeffrey Allen groped Thibodeaux's breast and touched her buttock. While in a work vehicle and at a second job location, Jeffrey Allen touched Thibodeaux's face in a suggestive manner.

c. Upon Thibodeaux's return to 1150 North Avenue, Thibodeux spoke with Area Supervisor Derrick Boddie. Thibodeaux explained to Derrick Boddie what happened. Derrick Boddie

called Allen Smith, Plant Manager. While Thibodeaux was

waiting for Allen Smith, Jeffrey Allen came over to where

Thibodeaux was sitting and touched her nose. Once Allen Smith

arrived, Thibodeaux informed him of what Jeffrey Allen did to

her.

d. Defendant did not take the appropriate corrective action to timely

investigate or properly address Thibodeaux's complaints.  Rather,

Thibodeaux suffered retaliation because she had reported Jeffrey

Allen's actions.

e. On August 13, 2019, Defendant placed Thibodeaux on Administrative

Leave with Pay while her complaints were investigated.

f. On August 30, 2019, Defendant closed the investigation stating

that Thibodeux's complaint could not be substantiated.

**g.** After Thibodeaux returned to work, she was subject to constant retaliation

and harassment.

h. Around the beginning of November, 2019, Thibodeaux was out working

when she was called back in and sent home.  Someone had reported that

Thibodeux was shooting a gun while she was out working.

i. Allen Smith refused to tell Thibodeaux who allegedly saw her or where she

was allegedly shooting a gun. This allegation was totally false, and a

subsequent investigation proved it to be false.  Whoever made the false

report did it with the intent of making Thibodeaux resign her position.

j.  After returning from leave caused by the investigation into the false gun claim, Thibodeaux was subjected to additional harassment, retaliation, defamation of character and bullying.  Several of Thibodeaux's coworkers spread rumors that Thibodeaux was sleeping with one coworker's boyfriend, that she was doing drugs with the boyfriend, that Thibodeaux has HIV, and that Thibodeaux was a COVID-19 carrier.

k.  The people making these statements were friendly with Jeffrey Allen at the time.

l.   The purpose of these statements was to make Thibodeaux leave her position.

m. Thibodeaux reported these false statements to Plant Manager Allen Smith, Installation Chief Todd Miles, and Concrete Area Supervisor Marquis Phelps, but nothing was done.

n.  Later, a coworker accused Thibodeaux of forging a doctor's note.  Because of this, Human Resources sent some paperwork to Thibodeaux's  doctor to fill out.

o.  Thibodeaux has reported this harassment, retaliation, defamation of character and bullying to Plant Manager Allen Smith, but no administrative actions have to be taken to stop it.

p.  In May of 2020, a coworker called Thibodeaux  "a piece of shit."  The
    coworker asked Thibodeaux's supervisor, "You haven't got rid of that piece
    of shit yet?"  Thibodeaux met with Installation Chief Todd Miles and Plant
    Manager Allen Smith about this hostility.  During the meeting, Smith
    recommended that she move to a different department.

q.  Additionally, Thibodeaux's medical information was disclosed to people
    who did not and do not need to know it.

r.  The constant harassment, retaliation, defamation of character and bullying
    took a severely negative toll on Thibodeaux's health.  Thiboeaux is under
    treatment by several doctors due to the stress of dealing with her hostile
    work environment. Due to Thibodeaux's medical condition, she ended up
    missing a good amount of work.  Thibodeaux used sick time and vacation
    time to cover for when she was out of work.

s.  Sometime in 2021, Defendant terminated Thibodeaux's employment.
    Thibodeaux was not provided with any written notices that Defendant was
    considering terminating her.  Thibodeaux was given no opportunity to
    respond. Thibodeaux was never provided any written notice that Defendant
    had actually terminated her.  This is why the actual date of termination is
    unknown.

t.  Thibodeaux was never provided any notices required by COBRA so that she

could continue on her health insurance.  As a result, she lost her health insurance.

u.  The actions of Thibodeaux's supervisors and coworkers were in retaliation for Thibodeaux having reported the sexual assault and battery committed against her by Jeffrey Allen. Before she reported this, Thibodeaux had no problems with anyone at work.

v.  During the time of her employment with Defendant, Thibodeaux constantly feared further harassment, retaliation, and intimidation by Defendant's management and supervisory officials, including the loss of her job.

Facts relating to Sylvia Fripp:

a.  Fripp first complained about Derek Ponder sexually harassing her on November 2015.

b.  Derek Ponder kept sexually harassing Fripp and she filed a second complaint on January 29, 2016

c.  Even though Derek Ponder was supposed to stay away from Fripp , Ponder used his influence to get Luther Foster, Fripp's immediate supervisor at the time, to try to get Fripp to be alone with Ponder.

d.  Fripp had no less that five meetings with various supervisory personnel to try to get them to take action on her complaints against Derek Ponder.  Some of these meetings were with Commissioner and Deputy Commissioners.

e.  Despite Fripp's complaints about Ponder, Ponder was told to show up at a job site where Fripp was working.

f.  On March 14, 2016, Fripp filed a third written complaint against Derek Ponder.

g.  On March 18, 2016, over four months after Fripp has first complained about Ponder's sexual harassment, Fripp was relocated to a different department, the Bridge Shop.

h.  During the period of November 2015 to March 2016, Derek Ponder filed several false reports in an attempt to damage Fripp's job status.

i.  Once Fripp was relocated to the Bridge Shop, Fripp's work was unduly scrutinized, Fripp was assigned with poor vehicles, equipment and tools, subjected Fripp to hazardous working conditions.

j.  In 2017, Fripp submitted a request for extra pay for work out of class. Plaintiff's request was denied while other workers' requests were approved.

k.  On or about March 31, 2017, Fripp filed a grievance against Tony Turman, Bridge Maintenance Supervisor, for abuse of power, intimidation, unsafe working conditions, and retaliation.

l.  In or around May 2017, Fripp, who worked as an Equipment Operator II, Clarence Paul, Welder, and several Construction Maintenance Workers (Joseph Banks, James Spencer, Steffon Mitchell, and Jerrod Dill, and John Tolbert) complained that Turman abused his authority as a crew supervisor

and exposed them to unsafe working conditions.

m. On or about July 12, 2017, Fripp filed a second grievance against Turman for abuse of power, unsafe working conditions, retaliation, falsifying documents (maintenance work orders), and performing substandard work, but Defendant again failed to take any action to resolve Fripp's concerns.

n. In or around November 20, 2017, Fripp complained in writing to Allen Smith that some of her male supervisors had abused their authority in the workplace including Horace Scott, Joseph Banks, Victor Price, and Tony Turman, Bridge Maintenance Supervisor, by repeatedly subjecting her to harassment, intimidation, and bullying.  Specifically, Fripp told Allen Smith that Victor Price had inappropriately touched her face in a sexual manner while working with him on a job. Other workers witnessed Victor Price do this.  Nothing was ever done to Victor Price.

o. In November 2017, Fripp was passed over for a promotion in favor of Joseph Banks, a less qualified male.

p. In June 2018, Allen Smith refused to accommodate Fripp's request for light duty work. However, Defendant accommodated other similarly-situated employees (injured on the job) such as Lannie Milton, Deborah Fowler, and Kenya Mims who had requested light duty.  Since Fripp could not perform her job without an accommodation for light duty, Fripp requested Family and

Medical Leave from June 1, 2018 through June 1, 2019.  Defendant approved Fripp's request.

q.  In November 2019, someone had told Derek Ponder when Fripp was scheduled to return to work.  Fripp  did not even know at that time.  The two most likely suspects are Nia Parker and Allen Smith.  Whoever it was assisted Derek Ponder in sexually harassing Fripp, because when Fripp did return in December 2019, Ponder made it a point to go to the office where she was stationed to intimidate her.

r.  In December 2019, Ola Stephens told Fripp that she (Stephens) had filed a sexual harassment complaint against Ponder.

s.  Ponder did not stop harassing Fripp until he was arrested for rape in July 2020.

t.  Even after Ponder was arrested, Fripp's supervisors and coworkers continued to harass and bully Fripp in retaliation for her reports of sexual harassment. They continued to harass Fripp in the same way they had been harassing her since she started working there. For example, Allen Smith constantly attempted to have Fripp perform work that was outside the restrictions placed on her by the City's Workers Compensation doctor.  They refused to schedule Fripp for light duty work. They scheduled doctor's evaluations at a facility not related to the Workers Compensation case and unknown to Fripp's Workers Compensation attorney.

u. Defendant terminated Fripp's employment for false reasons.  The reasons listed were (1) the failure to attend the doctor's evaluation they scheduled without telling her Workers Compensation Attorney and (2) missing work even though (a) she was out because of Covid-19 and (b) she had 3 weeks of sick and vacation time she could have used. Fripp and her counsel met with Defendant' agents via Zoom and pointed this out to them.  Defendant ignored the facts and still terminated Fripp's employment.

Facts relating to Christian Kelley:

a. Kenneth Brinson was hired as Business Manager at Defendant's Department of Public Works North Avenue location in December 2015.

b. From December 2015 to January 2017, Brinson would go into Kelley's office, hang out, and try to make her have personal conversations with him about non-City business things.  Brinson would sit in Kelley's office for one to three hours per day and make her very uncomfortable. She told Irvin Washington, her immediate supervisor, but nothing was done.

c. Several mornings, when Kelley got to her office, Brinson would already be in her office waiting for her to get in to talk to him.  This made Kelley very uncomfortable.

d. Brinson would walk through the warehouse and stare at Kelley without saying anything.  Brinson just stared and circled the warehouse.  This made Kelley really uncomfortable.

e. In January 2016, Kelley called a meeting to discuss her concerns about Brinson's workplace harassment.  Brinson stood over her tapping his chest and asking if Kelley had anything she needed to get off her chest in an aggressive manner.  Brinson was not willing to address any of Kelley's concerns, stating that he was the Business Manager, this is the City of Atlanta property, he had the keys, and he would do what he wanted.

f. That afternoon, Brinson gives Kelley a written reprimand for a violation of city vehicle policy that had happened before Brinson even worked there.

g. Brinson started asking Irvin Washington, Kelley's immediate supervisor, to file false reports against her.

h. Kenneth Brinson created a rule for the warehouse that no one could work overtime, but he only enforced it against Kelley.

i. On January 7, 2016, Kelley sent an email requesting a meeting with Cotena Alexander regarding the situation with Brinson.  Cotena Alexander never set up the meeting.

j. On January 11, 2016, a training request that Kelley had submitted was denied.  Irvin Washington told her to submit additional information, which she did.

k. On February 8, 2016, Kelley was informed her training request was denied.

l. In March, 2016, Brinson banned Kelley from driving city vehicles.

m. In June of 2016, Kelley was bent over putting things in her car when Brinson

came up behind her and started yelling at her about overtime.

n. January 18, 2017, Kelley was in the printer room when she heard Brinson and Shankeya Battle talking about her very negatively about Kelley.  They were using a lot of profanity and calling her a lot of names.

o. There were no efforts by Defendant to resolve this situation.

**59.**

What the three women have in common is after reporting being sexually harassed, the complaints were ignored, and they were subject to retaliation including false claims being made against them and adverse employment actions.

**60.**

Accordingly, Plaintiff is entitled to an award for future pecuniary losses, emotional pain and suffering, mental anguish, loss of enjoyment of life, and other non-pecuniary damages for the Defendant's intentional acts of discrimination and retaliation.

## **COUNT II – RETALIATION**

### **42 U.S.C. § 1983 and Fourteenth Amendment to the U.S. Constitution And Title VII of the Civil Rights Act of 1964**

**61.**

In November 2019, Plaintiff engaged in EEO activity protected under Title VII by complaining to Human Resources about discrimination, harassment, and retaliation.

**62.**

Plaintiff continued to perform her job dutiesthereafter, but Plaintiff endured constant harassment and retaliation by her supervisors and co-workers.

**63.**

After Plaintiff complained to Defendant's Department of Human Resources and other supervisory personnel, Plaintiff suffered tangible adverse employment actions, including being falsely accused of violations, being denied backpay, raises, and promotional opportunities.

**64.**

Defendant's unlawful actions, by and through their employees, constitute retaliation in violation of Title VII and 42 USC 1983.

**65.**

"A plaintiff alleging retaliation must first establish a prima facie case by showing that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action."

Bryant v. Jones, 575 F.3d 1281 (11th Cir. 2009).

**66.**

Plaintiff has made internal complaints about sexual harassment which are statutorily protected activity.

**67.**

A material adverse employment action is one that might have " 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " See Burlington N. & Santa Fe Ry. Co. v. White , 548 U.S. 53, 68, 126 S. Ct. 2405 2415, 165 L.Ed.2d 345 (2006) (quoting Rochon v. Gonzales , 438 F.3d 1211, 1219 (D.C. Cir. 2006.

Johnson v. Miami-Dade Cnty., 948 F.3d 1318 (11th Cir. 2020)]

**68.**

After Plaintiff complained to Defendant's Department of Human Resources and other supervisory personnel, Plaintiff suffered tangible adverse employment actions, including being wrongfully accused of criminal activity, being denied backpay, raises, and promotional opportunities, and ultimately wrongful termination.

**69.**

"We have explained that "[i]n order to establish the requisite 'causal link' required as part of a prima facie case, a plaintiff need only establish that the protected activity and the adverse action were not wholly unrelated."

Goldsmith v. City of Atmore , 996 F.2d 1155, 1163 (11th Cir. 1993) (citations and internal quotation marks omitted).

**70.**

Again, after Plaintiff complained to Defendant's Department of Human

Resources and other supervisory personnel, Plaintiff suffered tangible adverse

employment actions, including being denied backpay, raises, and promotional

opportunities, and ultimately wrongful termination

**71.**

Accordingly, Plaintiff is entitled to an award for future pecuniary losses,

emotional pain and suffering, mental anguish, loss of enjoyment of life, and other

non-pecuniary damages for the Defendant's intentional acts of discrimination and

retaliation.

**72.**

Defendant's agents were acting under color of state law and violated

Plainitiff's Constitutional rights.

**73.**

Defendant is responsible for the actions of its agents, who were acting

under the color of state law, because they were acting in accordance with an

official custom or policy of Defendant.  Sexual harassment of and retaliation

against women is rampant in Defendant's Public Works Department, with the

supervisors covering up for the harassers and punishing the victims.  See

paragraphs 12-44 and 57 of this Complaint.

## COUNT III -  VIOLATION OF FLSA

**74.**

Defendant, as a city, is subject to the provisions of the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*

**75.**

Defendant made numerous record keeping errors regarding the hours Plaintiff worked.

**76.**

Defendant's poor record keeping cost the Plaintiff a substantial amount of money over the course of her employment.  Specifically this led to Plaintiff not being paid time-and-a half for overtime for some weeks that Plaintiff worked over 40 hours. This is not a claim of a stand-alone violation of record keeping duties.

**77.**

"[T]he requirements to state a claim of a FLSA violation are quite straightforward." Sec'y of Labor v. Labbe, 319 F. App'x 761, 763 (11th Cir. 2008). To state a claim under the FLSA for unpaid wages, an employee must allege (1) an employment relationship; (2) that the employer or employee engaged in interstate commerce; and (3) that the employer failed to pay overtime compensation and/or minimum wages. See Morgan v. Family Dollar Stores, 551 F.3d 1233,1277 n.68 (11th Cir. 2008). Additionally, "[t]here is no requirement that the Plaintiff explicitly state the amount of damage, but only that the Plaintiff worked in excess of forty hours a week and was not paid overtime wages." Ramos v. Aventura Limousine & Transp. Serv., Inc., No. 12-21693-CIV, 2012 WL 3834962, at *2 (S.D. Fla. Sept. 4,

2012).

**78.**

Defendant's poor record keeping was willful triggering a three-year statute of limitations.

**79.**

"Although the ordinary statute of limitations in cases brought under the FLSA is two years, a cause of action arising out of a willful violation of the FLSA may be commenced within three years after the cause of action accrued. 29 U.S.C § 255(a). A willful violation may be found when the employer "disregarded the very `possibility' that it was violating the statute." Alvarez v. IBP, Inc., 339 F.3d 894, 908-09 (9th Cir.2003) (citing Herman, 172 F.3d at 141). The determination of willfulness is "a mixed question of law and fact." Id. at 908.

Allen v. Board of Public Educ. for Bibb County, 495 F.3d 1306 (11th Cir. 2007)

**80.**

Plaintiff was a non-exempt employee under the FLSA.

**81.**

Due to Defendant's FLSA violations, Plaintiff is entitled to recover from Defendant compensation for unpaid minimum and/or overtime wages; an additional equal amount as liquidated damages; and reasonable attorneys' fees, costs and expenses of this action, pursuant to 29 U.S.C. §

216(b).

## <u>COUNT IV – INVASION OF PRIVACY</u>

### 82.

During the time Plaintiff worked for Defendant, Plaintiff's supervisor Allen Smith and others working for Defendant disclosed Plaintiff's medical records to various people, who had no right or need to know Plaintiff's medical condition, in the Public Works Department.

### 83.

Defendant's agents acts constitute the tort of unauthorized public disclosure of private facts (invasion of privacy).

### 84.

"Medical records are within the right of privacy afforded by the Federal Constitution. United States v. Westinghouse Elec. Corp., 638 F.2d 570, 577(IV) (3d Cir.1980). Because Georgia recognizes an even broader concept of privacy, the personal medical records of this state's citizens clearly are protected by that right as guaranteed by our constitution."

<u>King v. State</u>, 535 S.E.2d 492, 272 Ga. 788 (Ga. 2000)

### 85.

"Personal medical records are protected by Georgia's constitutional right to privacy and cannot be disclosed without the patient's consent unless disclosure is otherwise required by law. See Ussery v. Children's Healthcare of Atlanta, 289

Ga.App. 255, 269(4), 656 S.E.2d 882 (2008)."

Gerguis v. Statesboro Hma Med. Grp., LLC., 331 Ga.App. 867, 772 S.E.2d 227
(Ga. App. 2015).

## 86.

In the event that Georgia would recognize a violation of HIPAA as a
violation of the applicable standard of care, Defendant's conduct also violated
HIPAA.

## 87.

Defendant Allen Smith disclosed Plaintiff's medical records in the course of
employment, rendering Defendant liable under the doctrine of respondeat superior.
Allen Smith had let the coworker see Plaintiff's medical file. Because of this, the
coworker accused Plaintiff of forging a doctor's note.  As a result, Human
Resources sent some paperwork to Plaintiff's doctor to fill out.

## 88.

As a result of said Defendant's conduct, Plaintiff has suffered personal injury,
as manifested by injured feelings, mental anguish, and emotional distress.

## 89.

Plaintiff's medical records were disclosed intentionally in an attempt to
harass and embarrass Plaintiff in furtherance of Defendant's campaign to retaliate
against Plaintiff.

**90.**

By disclosing Plaintiff's medical records, Defendant has acted in bad faith towards Plaintiff and therefore, Plaintiff is entitled to an award of expenses of litigation including reasonable attorney's fees pursuant to O.C.G.A. § 13-6-11.

**91.**

Defendant's actions in disclosing the medical records show willful misconduct, malice, fraud, wantonness, oppression and/or that entire want of care which would raise the presumption of conscious indifference to the consequences, and punitive damages are authorized.

## COUNT V – FAILURE TO PROVIDE COBRA NOTICE

**92.**

Plaintiff  was working for Defendant until spring of 2021.

**93.**

Defendant terminated Plaintiff without providing any COBRA notice, causing Plaintiff to lose her health insurance.  Plaintiff found out she was fired by calling Human Resources about health insurance.  The lady Plaintiff spoke with said that Plaintiff was fired as of April 1, 2021.

**94.**

A failure to provide timely COBRA coverage notification is actionable under Section 502 of  ERISA, 29 U.S.C. § 1132.

**95.**

As a result of Defendant's failure to provide notice, Plaintiff is entitled to

actual damages plus an award of up to $110- per-day, reflecting the period of the

delay in providing the required notice.

29 U.S.C. §1132(c)(1); 29 C.F.R. § 2575.502c-1.

WHEREFORE, Plaintiff prays that:

A.   Judgment be entered against the Defendant;

B.   Grant a trial by jury;

C.   Award general, compensatory, liquidated, and actual
     Damages;

D.   Award all other damages allowed by law;

E.   Declare the Defendant's conduct complained of herein to
     be in violation of the Plaintiff's rights as secured by Title
     VII;

F.   Order Defendant to compensate, reimburse, and make Plaintiff
     whole for all the benefits she would have received but for
     Defendant's illegal actions, including, but not limited to, back
     pay,front pay, medical expenses, other employment benefits,
     promotions, bonuses, seniority, and interest;

G.   Expunge any adverse employment actions from

Plaintiff's personnel records as a result of Defendant's unlawful conduct;

H.   On the FLSA claim, award Plaintiff compensation for unpaid minimum and/or overtime wages; an additional equal amount as liquidated damages; and reasonable attorneys' fees, costs and expenses of this action, pursuant to 29 U.S.C. § 216(b).

I.   Award Plaintiff general and special damages for Defendant's invasion of privacy;

J.   On the claim of invasion of privacy, award expenses of litigation, including reasonable attorneys' fees, reasonable expert witness fees,and other costs of litigation; and

K.   On the claim of invasion of privacy award punitive damages as provided by law;

L.   On the COBRA claim award actual damages plus an award of up to $110- per-day, reflecting the period of the delay in providing the required notice; and

M.   Grant such other and further relief as the Court shall deem just and proper.

Respectfully submitted:


_____

Kennon Peebles, Jr.
Attorney for Plaintiff
Georgia Bar No.: 570151

3296 Summit Ridge Pkwy
Suite 1720
Duluth, Georgia 30096
Tel. 470-395-4427
Fax 678-261-0904
Email: kennon@peebleslaw.net

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1D, the undersigned counsel certifies that the foregoing

**PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES** has

been prepared in Times New Roman 14 point in compliance with LR 5.1B.

This the ____ day of _____, 2021.

_____
Kennon Peebles, Jr.
Attorney for Plaintiff
Georgia Bar No.: 570151

3296 Summit Ridge Pkwy
Suite 1720
Duluth, Georgia 30096
Tel. 470-395-4427
Fax 678-261-0904
Email: kennon@peebleslaw.net

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served upon the Defendant a copy of the foregoing document on Defendant by email to the following:

Deitra S. Jones, Esq.  (jonesdei@gtlaw.com)

This the \_\_\_\_ day of _____, 2021.

_____
Kennon Peebles, Jr.
Attorney for Plaintiff
Georgia Bar No.: 570151

3296 Summit Ridge Pkwy
Suite 1720
Duluth, Georgia 30096
Tel. 470-395-4427
Fax 678-261-0904
Email: kennon@peebleslaw.net